Revised November 1, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 98-10864**
_____

**B. C. FOREMAN; IDA CLARK; OTIS TARVER; DOMINIC**
**DE LA CRUZ; LOUIS DAVIS; MANDY PESINA,**

**Plaintiffs-Appellees,**

**VERSUS**

**DALLAS COUNTY, TEXAS; COMMISSIONERS COURT OF DALLAS**
**COUNTY, TEXAS; LEE F. JACKSON, Dallas County Judge;**
**JIM JACKSON; JOHN WILEY PRICE; MIKE CANTRELL; KENNETH**
**A. MAYFIELD, Dallas County Commissioners; BRUCE SHERBET,**
**Elections Administrator of Dallas County, Texas,**

**Defendants-Appellants.**

_____

Appeal from the United States District Court
For the Northern District of Texas
_____

October 14, 1999

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

The plaintiffs-appellees, B. C. Foreman, Ida Clark, Otis
Tarver, Dominic De La Cruz, Louis Davis, and Mandy Persina
("plaintiffs"), served as precinct election judges in Dallas
County, Texas. The plaintiffs subsequently lost those positions

when the defendants-appellants, Dallas County, the Commissioners Court of Dallas County, and other ("defendants"), adopted a new method of appointing precinct election judges. The plaintiffs subsequently sued the defendants under § 5 of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973 *et seq.*, alleging that the defendants had not precleared the appointment method for precinct judges with the United States Department of Justice as required by statute, 42 U.S.C. § 1973c. After lengthy and protracted litigation, which included an appeal to the United States Supreme Court, **Foreman v. Dallas County, Tex.**, 521 U.S. 979 (1997) (per curiam), the suit was dismissed by a three-judge district court as moot when the Texas legislature eventually enacted a new and different appointment method. In this appeal we are asked to decide whether the district court erred in granting the plaintiffs attorney's fees as prevailing parties under 42 U.S.C. § 1973*l*(e). We reverse the district court's award of attorney's fees and render judgment that the plaintiff's take no attorney's fees.

## I.

In Texas presiding election judges are assigned to local precincts and are responsible for managing the elections which occur there. *See* Tex. Elec. Code § 32.071. An election judge's responsibilities include administering oaths at polling places, preserving order and preventing breaches of the peace, and

2

enforcing the provisions of the Texas Election Code. *See* Tex. Elec. Code §§ 32.072-.075. The alternate presiding judge serves as presiding judge for an election if the presiding judge is unable to serve. Tex. Elec. Code § 32.001(b); ***Foreman v. Dallas County, Tex.***, 990 F. Supp. 505 (N.D. Tex. 1998) (outlining various responsibilities of election judges).

In 1996, before this suit was filed, the Texas Election Code required the Dallas County Commissioners Court to appoint on an annual basis presiding and alternate election judges for each precinct. Tex. Elec. Code. § 32.002(a) (repealed 1997). Although the Code required the Commissioners Court to "consider" the recommendations of the County Elections Administrator before making an appointment, the statute vested the Commissioners Court with the discretion to appoint any qualified person. Tex. Elec. Code § 32.002(d) (repealed 1997).

Between November 1, 1972, when Texas became a covered jurisdiction under the Voting Rights Act, and October 1996, when the Commissioners Court adopted the appointment plan at issue, the Commissioners Court adopted various methods for selecting election judges, without first obtaining preclearance from the Department of Justice. *See* ***Foreman***, 990 F. Supp. at 507 (detailing the chronology of changes). For example, between 1982 and 1995, the Commissioners Court appointed election judges pursuant to a presidential election formula. This formula required the presiding

3

judge to be a member of the party whose presidential candidate carried the precinct in the most recent presidential election. The alternate judge was appointed from the other party. In 1995, however, the Commissioners Court adopted a senatorial method for appointing election judges. This method was based on which party carried a precinct in the most recent senate race. Dallas County, Texas Order No. 95-1313 (1995) (repealed 1996) (hereinafter "1995 Order").

In September 1996, the Commissioners Court changed its appointment method again. This time, in all precincts where the Republican candidate for Senate received the most votes in the 1994 election, the person submitted or approved by the Republican party would be named the presiding election judge.[1] A majority of the Commissioners Court could vote, however, not to appoint the proposed judge. In all other precincts, the commissioner who represented the precinct determined whether the person submitted or approved by the Republican or Democratic party would be appointed presiding election judge. The person submitted or approved by the party whose candidate was not chosen was named the alternate election judge, subject to the veto of a majority of the Commissioners Court. Dallas County, Texas Order No. 96-1630 (1996) (repealed 1996) (hereinafter "1996 Order"). Because this new

_____

[1] The person submitted or approved by the Democratic party would be named alternate presiding election judge.

methodology gave the individual commissioners influence over the appointment of election judges in precincts where the Republican Senate candidate did not win a majority, the practical effect was more Republican and fewer Democratic presiding judges.

On October 3, 1996, the plaintiffs -- black and Hispanic voters who had not been reappointed as election judges -- filed suit alleging that the 1996 Order, and its appointment procedure, had not received preclearance as required by § 5 of the Voting Rights Act. The plaintiffs also filed a motion for a temporary restraining order to enjoin the defendants from implementing the 1996 Order.[2] The district court granted the motion and issued a temporary restraining order, and convened a three-judge court as required by the VRA to consider the merits.

A few days later the Commissioners Court rescinded the 1996 Order and, claiming authority from § 32.002 of the Election Code, proceeded to appoint election judges in a purely discretionary manner. The Commissioners Court, which consisted of four Republicans and one Democrat, then appointed only Republicans as presiding election judges, and Democrats as alternate presiding election judges. In addition to clearing the precincts of all presiding election judges from the Democratic party, at least 54 black and 33 Hispanic election judges were not reappointed. Dallas County, Texas Order No. 96-1950 (1996) (repealed 1997) ("October

---

[2] The plaintiffs also moved to enjoin the defendants from implementing the previous 1995 Order.

Order").

The plaintiffs subsequently amended their complaint and sought declaratory and injunctive relief enjoining the Commissioners Court from implementing the October Order for failure to receive preclearance under § 5 of the VRA. The three-judge court denied the request for injunctive relief and allowed the 1996 elections to take place under the supervision of the election judges that had been appointed under the October Order. After the election was over, the three-judge court dismissed the plaintiffs' suit, holding that § 5 of the VRA did not apply to the Commissioner Court's procedures for appointing precinct election judges. Because the entire Texas Election Code had been precleared in 1985, the three-judge court reasoned that the Commissioners Court was merely exercising its discretion pursuant to the precleared Election Code.

On appeal, the Supreme Court rejected the holding of the three-judge court and found that the appointment procedures were properly covered by § 5 of the VRA. *Foreman v. Dallas County, Tex.*, 117 S. Ct. 2357, 2358 (1997) (per curiam). The Court noted, however, that the determinative question was whether the county sought to administer a procedure that was different from the one in place on November 1, 1972, the date the VRA went into effect in Texas. *Id.* at 2358-59. Because the record was silent on the procedures for appointing election judges in 1972, the Supreme Court on June 27, 1997 vacated the three-judge court's ruling and

remanded the case for further findings. *Id.* at 2359.

However, prior to the Supreme Court's decision the Texas legislature amended § 32.002 of the Texas Election Code and adopted a gubernatorial method for selecting election judges. *See* Tex. Elec. Code § 32.002 (1999). The Justice Department precleared the revised statute on September 2, 1997, and on October 7, 1997, the Commissioners Court appointed new election judges in accordance with the new method.[3] On January 8, 1998, the three-judge court dismissed the plaintiffs' § 5 preclearance claim as moot, leaving open the question of attorney's fees. On the plaintiffs' motion, a single district judge found that the plaintiffs were prevailing parties within the meaning of 42 U.S.C. § 1973*l*(e), and awarded the plaintiffs roughly $183,263 in attorney's fees. The defendants timely appealed.

## II.

We review a district court's award of attorney's fees for abuse of discretion and its supporting factual findings for clear error. *Wilson v. Mayor of St. Francisville*, 135 F.3d 996, 998 (5th Cir. 1998). We review the conclusions of law underlying the award of attorney's fees *de novo*. *Marre v. United States*, 117 F.3d 297, 301 (5th Cir. 1997) (citing *Texas Food Indus. Ass'n v. United States Dept. of Agric.*, 81 F.3d 578, 580 (5th Cir.1996)).

---

[3] All six plaintiffs were reappointed as presiding judges.

7

III.

On appeal the defendants assail the district court's finding that the plaintiffs qualify as prevailing parties under 42 U.S.C. § 1973*l*(e).[4] As reflected in its memorandum order, the district court based that determination on two separate grounds. The district court first found that the plaintiffs were prevailing parties because their suit was a "significant catalyst" behind the Texas legislature's decision to amend § 32.002 of the Election Code and enact a gubernatorial appointment procedure. The court also found that the plaintiffs were prevailing parties because the plaintiffs were successful in obtaining a temporary restraining order. We begin our review of those two findings with a brief look at our guiding principles.

Only "prevailing parties" may recover attorney's fees under 42 U.S.C. §§ 1973*l*(e).[5] What it means to "prevail" was recently

_____

[4] Section 1973*l*(e) provides in relevant part:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1973*l*(e).

[5] Because the phrase "prevailing party" connotes the same general meaning under § 1973*l*(e) and 42 U.S.C. § 1988, cases under both Acts apply the same principles when determining plaintiffs' entitlement to attorney's fees. *See* **Posada v. Lamb County**, 716 F.2d 1066, 1071 (5th Cir. 1983).

8

clarified by the Supreme Court in *Farrar v. Hobby*, 506 U.S. 103, 109 (1992). There, the Supreme Court explained that a plaintiff prevails "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111-12; *TK's Video, Inc. v. Denton County, Texas*, 24 F.3d 705, 711 (5th Cir. 1994). The Court further observed that "[n]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Farrar,* 506 U.S. at 113. Thus, "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 111. With those standards in mind, we turn to the substantive merits of this appeal.

A.

The first matter we address is the district court's finding that the plaintiffs are prevailing parties because their suit was a significant "catalyst" behind the Texas legislature's decision to amend the appointment procedures. On appeal the defendants argue that the district court's finding is incorrect because prevailing party status can no longer be based on a catalyst theory after the Supreme Court's decision in *Farrar*. The defendants further contend

9

that even if the catalyst theory remains good law, it cannot be applied the acts of third parties and, in particular, to the acts of a general legislature.

By bringing this challenge to the district court's use of the catalyst theory, the defendants have ventured into an unsettled area of the law. Before the Supreme Court's decision in *Farrar*, the catalyst theory was routinely applied in this and other circuits. *See **Heath v. Brown***, 858 F.2d 1092, 1094 (5th Cir. 1988); ***Garcia v. Guerra***, 744 F.2d 1159, 1162 (5th Cir. 1984); ***Williams v. Leatherbury***, 672 F.2d 549, 550-51 (5th Cir. 1982). It allowed a plaintiff to achieve prevailing party status -- even in the absence of a formal victory in court -- if the plaintiff's suit was a "substantial factor or a significant catalyst" in obtaining the relief sought. *See **Leatherbury***, 672 F.2d at 550-51 (explaining catalyst theory).

After ***Farrar***, however, the continuing validity of the catalyst theory is in serious doubt. In ***Farrar*** the Supreme Court seemed to narrow the circumstances in which a party may claim prevailing party status. The Court noted that "to qualify as a prevailing party . . . [t]he plaintiff must obtain an *enforceable judgment . . . or comparable relief through a consent decree or settlement.*" ***Id.*** at 111 (emphasis added). The Court declared that "[o]nly under these circumstances can civil rights litigation effect 'the material alteration of the *legal relationship* of the parties' and

10

thereby transform the plaintiff into a prevailing party." ***Id.***
(emphasis added). The Court added that "[n]o material alteration
of the legal relationship between the parties occurs until the
plaintiff becomes entitled to enforce a *judgment, consent decree,*
*or settlement* against the defendant." ***Id.*** at 113 (emphasis added).

The language in ***Farrar*** strongly suggests that a plaintiff must
obtain some merits-based relief which alters its legal standing
with the defendant before it may claim prevailing party status.
That, however, is seemingly at odds with the catalyst theory which
allows a plaintiff to claim prevailing party status even if there
is no material change in the legal relationship between the
parties. *See* ***Leatherbury***, 672 F.2d at 550 ("Success by judgment
may be self-evident, but a party may still "prevail" if its ends
are accomplished as a result of the litigation even without formal
judicial recognition"). This has led at least one court to
conclude that ***Farrar*** has swept the catalyst theory into the
judicial trash heap. *See* ***S-1 & S-2 v. State Bd. of Educ.***, 21 F.3d
49, 51 (4th Cir.) (en banc), *cert. denied*, 513 U.S. 876 (1994)
(expressly overruling the "catalyst" theory and stating that a
plaintiff may only qualify as a "prevailing party" by virtue of
"having obtained an enforceable judgment, consent decree, or
settlement giving some of the legal relief sought"). Other courts
have disagreed, finding that their respective versions of the
catalyst theory remain viable. *See, e.g.,* ***Ellis v. University of***

11

*Kansas Med. Ctr.*, 163 F.3d 1186 (10th Cir. 1999); *Brown v. Local 58, Int'l Bd. of Elec. Workers, AFL-CIO*, 76 F.3d 762 (6th Cir. 1996); *Marbley v. Bane*, 57 F.3d 224 (2d Cir. 1995); *Kilgour v. City of Pasadena*, 53 F.3d 1007 (9th Cir. 1995); *Zinn v. Shalala*, 35 F.3d 273 (7th Cir. 1994).

This Court has never fully explored the impact of *Farrar* on the catalyst theory. There have been a few cases after *Farrar* that have continued to apply the catalyst rule. *See, e.g.*, *Watkins v. Fordice*, 7 F.3d 453, 456 (5th Cir. 1993) (acknowledging the catalyst theory without discussing the potential conflict with *Farrar*)*; Pembroke v. Wood County*, 981 F.2d 225, 231 n.27 (5th Cir. 1993) (distinguishing *Farrar* and seeming to limit its holding to suits seeking money damages, but not discussing potential conflict between the catalyst theory and *Farrar*); *Milton v. Shalala*, 17 F.3d 812, 814-15 (5th Cir. 1994) (acknowledging the catalyst theory without discussing potential conflict with *Farrar*). And in one opinion we acknowledged the question and observed that the catalyst theory "might" still be good law. *Craig v. Gregg County*, 988 F.2d 18, 20-21 (5th Cir. 1993). But we have never addressed the issue directly. Though the defendants now urge us to engage in that close debate, we decline the invitation. Assuming, without deciding, that the catalyst theory still applies in this Circuit, the facts of this case do not support a finding that the plaintiffs

12

were prevailing parties under 42 U.S.C. § 1973*l*(e).

We have held that under the catalyst theory a plaintiff may obtain attorney's fees as a prevailing party only if it establishes (1) that the relief sought by plaintiff was in fact obtained, and (2) that the suit itself caused the defendant to alter its conduct. **Pembroke**, 981 F.2d at 230. In order to prove the requisite causation, the lawsuit must have been a "a substantial factor or a significant catalyst" in motivating the defendants to alter their behavior. **Robinson v. Kimbrough**, 652 F.2d 458, 466 (5th Cir. 1981). Here, the defendants assert that the plaintiffs do not qualify as prevailing parties because they failed to obtain the relief sought in their suit. The defendants also contend that there is insufficient evidence that the plaintiffs' action was a substantial factor in the Texas legislature's decision to adopt the gubernatorial appointment procedure. We agree on each count.

The plaintiffs brought suit under § 5 of the VRA. The gravamen of their complaint is that the defendants adopted the 1996 appointment procedure without preclearing it with the Department of Justice, as required by the statute. For relief the plaintiffs requested: (1) a declaration from the district court that the 1996 Order was legally unenforceable; (2) a temporary and permanent injunction against the defendants' use of any procedure that had not been precleared; (3) a declaration from the district court ordering the defendants to preclear the procedure; and (4) a

13

declaration from the district court ordering that the 1996 election be conducted using a legally enforceable procedure, or, alternatively, the procedure used from 1982 to 1995.

From a cursory reading of the plaintiffs' complaint it is evident that the plaintiffs filed this action solely to enforce § 5's preclearance procedures. It is equally apparent that all of the plaintiffs' requested relief flowed from the rights that accrued under § 5 of the VRA. Thus, when the Texas legislature adopted an entirely different appointment method, mooting the litigation, the plaintiffs went home empty handed. They received none of the substantive relief for which they originally filed suit.

The plaintiffs, however, would have us believe that they successfully obtained relief in the form of the newly-enacted gubernatorial method. They would point to the fact that under that new method they were reappointed to their old positions. Though carrying some initial appeal, their argument fails under close scrutiny.

The plaintiffs' complaint is filed under the narrow confines of § 5 of the VRA, with the stated intent of forcing the defendants to preclear the 1996 appointment procedure. It may be true that the plaintiffs filed this action with the goal of pressuring the defendants into adopting a different procedure. But hidden motives are not the stuff on which attorney's fees are based. A defendant cannot be asked to pay attorney's fees for relief which was never

14

demanded, or even made clear, in the plaintiff's complaint. Similarly, even under the catalyst theory it will be a rare case indeed where a defendant is made to pay attorney's fees for relief that was secured from an independent third-party who was never a party to the lawsuit.[6] We conclude that the district court clearly erred in finding that the plaintiffs were successful in obtaining the relief sought by filing this action.

Likewise, even if we assume that the plaintiffs did obtain some relief, there is insufficient evidence of a causal connection between the plaintiffs' individual suit and the Texas legislature's decision to revamp the appointment procedure. As evidenced by its name, the catalyst theory requires that a plaintiff prove that the suit itself was a catalyst for relief. That is, the plaintiff must prove that the plaintiff's suit was a "substantial factor" in achieving the relief sought. *Robinson*, 652 F.2d at 466. Critically, a plaintiff does not satisfy that standard with evidence of a causal connection in the most basic sense. Instead, the plaintiff must prove the lawsuit itself, as a discrete event, had a significant and identifiable influence on the attainment of relief. Considering that the legislative process is fraught with compromises, competing concerns, and unspoken motives, a plaintiff who attempts to prove that his individual suit was the catalyst

---

[6] We have been able to find no Fifth Circuit case which applies the catalyst theory under such circumstances.

behind the passage of general legislation faces a formidable task. *See **Milton v. Shalala***, 17 F.3d at 815 ("The mere possibility that Congress acted because of an individual claimant's suit (or reacted to a large number of similar suits) is too speculative in our view considering the many influences upon members of Congress in casting their votes. We agree with the cases that have refused to credit the change in law to a claimant's individual law suit and found the nexus between Congress's action and the law suit too attenuated.")

In this case, the district court found the necessary level of causation based solely on the affidavits of three Texas legislators filed after the new appointment method was adopted and after the suit was dismissed. In those affidavits the legislators essentially stated that the Texas legislature decided to enact the new procedure as a result of the plaintiffs' suit. The district court's exclusive reliance on those three affidavits was clearly erroneous.

No one legislator, or even a group of three legislators, has sufficient personal knowledge to declare the overall intent of the Texas legislature. *See **Bread Political Action Comm. v. Federal Elec. Comm.***, 455 U.S. 577, 582 n.3 (1982) (expressly refusing to give probative weight to after-the-fact affidavit of amendment sponsor regarding legislative intent); ***Milton***, 17 F.3d at 815. For that we rely on the official legislative record, which is itself

16

often insufficient, unhelpful or confusing. In this case, three post hoc, after-the-fact, affidavits do not, standing alone, prove that the plaintiffs' suit was a substantial factor in the legislature's decision. They may show that the plaintiffs' lawsuit was *a* factor, to be sure. But they in no way show that it was a "substantial factor." We are strengthened in that conclusion by the fact that the plaintiffs have pointed to no other evidence in the legislative record which affirmatively shows that the Texas legislature enacted the gubernatorial method in response to the plaintiffs' suit. Moreover, we find it significant that the Texas legislature began the process of amending the appointment method well before the plaintiffs initiated this action.[7]

Thus, even were we to find that the plaintiffs received the relief they sought, there is insufficient evidence that the plaintiffs' suit caused the Texas legislature to amend § 32.002 of

---

[7] The defendants correctly point out that an almost identical version of the bill that eventually became revised § 32.002 was introduced in the 1995 legislative session. *Compare* Tex. H.B. 2241, 74th Leg., R.S. (1995), *with* Tex. H.B. 331, 75th Leg., R.S. (1997) (introduced version), *and* Tex. Elec. Code § 32.002 (1999). The 1995 bill passed the Texas House as part of an omnibus election bill, but never passed the Senate. Then, a nearly identical bill was filed in the 1997 session. Tex. H.B. 331, 75th Leg., R.S. (1997) (introduced version). Therefore, the statutory change that the plaintiffs claim to have catalyzed was in fact being considered by the Texas legislature well before the plaintiffs' suit was filed. We note, additionally, that the relief sought by the plaintiffs' suit, i.e., preclearance by the Department of Justice of a change in voting procedures, is entirely separate and distinct from the change contemplated by the legislative acts, i.e., a substantive change in the procedure for selecting precinct judges.

the Election Code. We find that the district court committed clear error in finding that the plaintiffs' suit was the catalyst behind that legislative decision. This leaves us with the last remaining issue in this appeal, whether the district court erred in finding that the plaintiffs acquired prevailing party status by seeking and receiving a temporary restraining order.

B.

In its written order the district court held that "the plaintiffs did prevail with respect to their request for a temporary restraining order to enjoin the September 3, 1996, order." That, however, was the total extent of the district court's reasoning. On appeal the defendants assert that a temporary restraining order does not make a plaintiff a prevailing party. The defendants assert that it is merely a transitory order that has no affect on the merits of the litigation. We agree.

*Farrar* is clear. To achieve prevailing party status there must be "actual relief on the merits" which "materially alters the legal relationship between the parties." *Farrar*, 506 U.S. at 111. A temporary restraining order is not merits-based relief. Nor is it a final remedy. A temporary restraining order is a "stay put," equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation. As such, a temporary restraining order cannot

18

constitute the type merit-based relief that affords a plaintiff prevailing party status. The district court committed clear error in reaching a contrary conclusion.

IV.

Although today we do not decide whether the catalyst theory survives *Farrar* in this Circuit, we hold that even under the catalyst theory the district court clearly erred in finding that the plaintiffs were prevailing parties. Accordingly, as the district court abused its discretion in granting attorney's fees under 42 U.S.C. § 1973*l*(e), we reverse and render judgment that plaintiffs take no attorney's fees.

CARL E. STEWART, Circuit Judge, dissenting:

The majority has held that the district court clearly erred in finding that the plaintiffs were prevailing parties, and that therefore the district court abused its discretion in awarding the plaintiffs attorneys' fees under 42 U.S.C. § 1973*l*(e). While I agree that the catalyst theory is the appropriate basis upon which to decide this case, I cannot agree with the conclusion reached by the majority. For the following reasons I respectfully dissent.

This court reviews the district court's award of attorneys' fees for abuse of discretion, and the underlying factual findings are reviewed for clear error. See <u>League of United Latin American Citizens No. 4552 (LULAC) v. Roscoe Independent School District</u>, 119 F.3d 1228, 1232 (5th Cir. 1997). This court has clearly emphasized that a district court has broad discretion in determining the appropriate award of attorneys' fees. See <u>Associated Builders and Contractors of Louisiana Inc. v. Orleans Parish School Board</u>, 919 F.2d 374, 379 (5th Cir. 1990); <u>LULAC,</u> 119 F.3d at 1232. The determination of attorneys' fees is an "intensely factual" inquiry, and thus the district court's broad discretion in this area is appropriate because of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. <u>Associated Builders</u>, 919 F.2d at

379 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)); <u>see also</u> <u>Posada v. Lamb County, Tex</u>, 716 F.2d 1066, 1072 (5th Cir. 1983). Viewing the facts of the present case from this deferential standard of review, and considering the broad discretion that should be accorded the district court in this area I cannot agree with the majority that the district court clearly erred in its factual findings, and abused its discretion in awarding attorneys' fees to the plaintiffs.

To establish prevailing party status under the catalyst theory,[8] the plaintiffs must demonstrate (1) that the relief they sought was in fact obtained, and (2) that the suit itself caused the defendant to alter its conduct. <u>See</u> <u>Pembroke v. Wood County</u>, 981 F.2d 225, 230 (5th Cir. 1993). The majority opines that the plaintiffs filed this action solely to enforce the preclearance procedures mandated by § 5 of the Voting Rights Act, and that when the Texas legislature adopted a method of appointment that was different from the one specifically advocated by either the

_____

[8] In deciding this case the majority applies the catalyst theory, but states that "the continuing validity of the catalyst theory is in serious doubt" due to the Supreme Court's decision in <u>Farrar v. Hobby</u>, 506 U.S. 103, 109 (1992). The majority declines to decide whether the catalyst theory still applies in this Circuit, however, it is critical to acknowledge that post-<u>Farrar</u> this Circuit and the majority of other circuits have continued to apply the catalyst theory. <u>See, e.g.,</u> <u>Pembroke v. Wood County</u>, 981 F.2d 225, 231 n.27 (5th Cir. 1993); <u>Craig v. Gregg County</u>, 988 F.2d 18 (5th Cir. 1993); <u>Ellis v. University of Kansas Medical Center</u>, 163 F.3d 1186 (10th Cir. 1999); <u>Zinn v. Shalala</u>, 35 F.3d 273 (7th Cir. 1994).

plaintiffs or defendants, the plaintiffs "went home empty handed".
The record, however, does not support the majority's conclusion.

The plaintiffs, a group of African-American and Hispanic voters of Dallas County who had served as election judges, brought this complaint after the Commissioners Court of Dallas County ("defendants") sought to make changes in the appointment procedures for election judges. These changes which were adopted September 3, 1996 ("1996 Order") meant that the plaintiffs would lose their positions as election judges. The plaintiffs' original complaint, filed on October 3, 1996, alleged that the defendants changed the procedures for appointing election judges without the preclearance of the Department of Justice as required under § 5 of the Voting Rights Act. The plaintiffs sought declaratory and injunctive relief to block the implementation of any procedure that was not precleared, including a specific declaration that the 1996 Order was not legally enforceable. The plaintiffs were immediately successful on two fronts. First, the district court granted the plaintiffs' request for a temporary restraining order which blocked the defendants from implementing the 1996 Order. Furthermore, a few days after the district court issued the temporary restraining order the defendants rescinded the 1996 Order, and implemented a different procedure which granted the Commissioners Court of Dallas County discretion in selecting the election judges ("October Order"). As a result of the defendants response to the temporary restraining order the plaintiffs were successful in one of their

goals for the litigation which was to insure that the 1996 Order was not implemented. While the plaintiffs did not achieve this goal through a declaration from the district court that the 1996 Order was legally unenforceable, it is clear from the record that the defendants abandoned the 1996 Order in response to the litigation. The defendants abandoned the 1996 Order only five days after the temporary restraining order was issued that resulted in a short term cessation of the implementation of the 1996 Order. This court has recognized that when a lawsuit motivates a defendant to take voluntary action to alleviate the conditions outlined in the complaint, the plaintiff can be considered a prevailing party although they received no judicial decree. See Pembroke, 981 F.2d at 230.

The second goal of the plaintiffs' complaint was to have the procedures for appointing election judges precleared by the Department of Justice as prescribed in § 5 of the Voting Rights Act. After the defendants abandoned the 1996 Order and replaced it with a discretionary method of selecting election judges, the plaintiffs amended their complaint seeking § 5 preclearance of this procedure. The defendants steadfastly maintained throughout this litigation that the procedures to select election judges were not subject to preclearance under § 5 of the Voting Rights Act because these were discretionary activities as provided for in the Texas Election Code, which was precleared in 1985. The three judge district court agreed with the defendants' theory and refused the

plaintiffs' application for a permanent injunction on the grounds that the defendants' procedures were a proper exercise of discretion granted by the state election statute.

Despite this setback, the plaintiffs were eventually successful in receiving a judicial declaration that the procedures for appointing election judges are subject to the requirements of § 5 of the Voting Rights Act. The Supreme Court, in <u>Foreman v. Dallas County</u>, 521 U.S. 979, 980 (1997) held that the actions of the Commissioners Court of Dallas County in selecting election judges may require preclearance because the County's exercise of its discretion under the Texas Election Code does not shield its actions from § 5.[9] <u>Foreman v. Dallas County</u>, 521 U.S. 979, 980, 117 S.Ct. 2357, 2358, 138 L.Ed. 2d 972. This Supreme Court decision meant that the defendants would no longer be able to implement any procedure for appointing election judges without meeting the requirements of § 5 of the Voting Rights Act, including preclearance if the defendants sought to implement procedures that had not previously been precleared.

The Supreme Court remanded the case for further proceedings, but while the case was on appeal to the Supreme Court the Texas Legislature amended § 32.002 of the Texas Election Code to provide that all precinct election judges would be chosen based on the

---

[9] The Supreme Court did not make a final determination whether preclearance was required for the October Order because the record did not contain sufficient information. <u>See</u> <u>Foreman</u>, 521 U.S. at 981.

results from the gubernatorial elections ("gubernatorial method"). Texas submitted the gubernatorial method for Preclearance from the Department of Justice which was granted by the Attorney General in September 1997. Thus, the October 1996 Orders which were the subject of this litigation were superceded by the precleared gubernatorial method of selection adopted by the Texas legislature. As a result of the legislation the plaintiffs were all reappointed as election judges, and the defendants were forced to implement a system of selection which was precleared under § 5 of the Voting Rights Act.

The actions of the Texas legislature helped provide the plaintiffs with one aspect of the relief they sought by forcing the defendants to adopt a precleared method of appointing election judges. Therefore to be prevailing parties under the catalyst theory the plaintiffs must demonstrate that their suit was a significant contributing factor in the Texas legislature's actions. See Posada, 716 F.2d at 1072. The lawsuit need not be the sole reason for the legislature's action, but the plaintiffs' actions must have made an important contribution to the improvements which were achieved. Id. The majority finds that the district court clearly erred in finding that there was a causal link between the plaintiffs' lawsuit and the actions of the Texas legislature. Specifically, the majority holds that the district court clearly erred in its reliance on the affidavits of three Texas legislators to establish this causal link. I disagree

with the majority that the district court clearly erred in relying on these affidavits.

The majority cites <u>Bread Political Action Committee v. Federal Election Committee</u>, 455 U.S.577, 582 n.3 (1982) for the proposition that no single legislator, or even a group of three legislators has sufficient personal knowledge to declare the overall intent of the legislature. In <u>Bread Political Action Committee</u>, the Supreme Court interpreted the language of the Federal Election Campaign Act of 1971("FECA"). The plaintiffs argued that to interpret the meaning of FECA the Court should not rely solely on the language of the statute but instead should expansively construe the statute. See <u>Bread Political Action Comm.</u>, 455 U.S. at 581. As part of their evidence to convince the Court to adopt this expansive construction of FECA the plaintiffs offered the affidavit of the senator who sponsored the amendment as proof that the legislature intended for the bill to be liberally construed by the courts. The senator's opinion contradicted the language of the bill itself, and the Court concluded that the senator's statements should be given no probative weight regarding the legislative intent. See <u>Bread</u>, 455 U.S. at 582 n.3.

The present case is clearly distinguishable from <u>Bread</u> because in this case the district court did not rely on the affidavits of the Texas legislators to interpret the meaning of the Texas Election Code, or the legislative intent in regards to how the statute should be applied. Instead the plaintiffs offered

these affidavits to demonstrate that their lawsuit was a catalyst in the passage of the legislation, including motivating the introduction of the legislation. The question in <u>Bread</u> was legislative intent, and the question in this case is legislative motive. In determining legislative motive it is helpful to examine different factors.

It is logical that in seeking to interpret the meaning of a statute that courts should reject the post-hoc opinions of legislators as controlling evidence because the courts already have adequate information that can be gleaned from the language of the statute itself or the official legislative history. <u>See</u> <u>Bread</u>, 455 U.S. at 580 (stating that analysis of the issue of statutory construction must begin with the language of the statute itself). However, what will often not be found in the language of a statute or the official legislative history is the motivation for introducing a bill, or each member of the legislatures reasons for supporting the legislation. The majority acknowledges that legislative history is often "insufficient, unhelpful or confusing." Absent a holding that a party can never conclusively establish that a lawsuit is a catalyst for legislation because of the impreciseness of the proof available, we must acknowledge some reasonable method for parties to prove that their actions were a catalyst in the passage of legislation. One reasonable method of establishing that a lawsuit was a significant factor in the introduction and passage of legislation is to determine the

legislators' motivation by considering the legislators' statements about their motivation.

The plaintiffs received affidavits from three Texas legislators, Senator Royce West ("Senator West"), Representative Debra Danburg ("Representative Danburg"), and Representative Terri Hodge ("Representative Hodge"). Senator West stated that he introduced Senate Bill 130, which advocated the gubernatorial method of appointing election judges after hearing about the defendants' 1996 Order which would have altered the selection procedures. Senator West further revealed that he attended a public meeting to voice his concerns to the defendants about the change of procedures in choosing presiding election judges. Finally, Senator West stated that he was involved in discussions with the plaintiffs' counsel about pursuing the present lawsuit, and that the present lawsuit served as a catalyst for his introduction of the legislation in the Texas Senate. The majority states that the legislators do not have personal knowledge of the motivations of the legislature, however, as the sponsor of the Senate bill Senator West certainly has personal knowledge of what caused him to introduce the legislation which eventually was passed into law by the legislature.

Representative Danburg, who serves as the chair of the Texas House of Representatives Committee on Elections, introduced House Bill 331 which was similar to Senator West's Senate bill in that it also advocated the use of the gubernatorial method for appointing

election judges. Representative Danburg stated that when she introduced House Bill 331 she was aware of the lawsuit and it served as a catalyst for her to introduce the bill, and that the lawsuit was a causal factor in the action taken by the legislature. It is difficult to dispute that a legislator knows their own motivations for introducing bill and what influenced them to take that action.

Representative Hodge who is a member of the Dallas County delegation to the Texas House of Representatives declared that she became aware of this lawsuit in the Fall of 1996, this lawsuit was the subject of conversation among her colleagues in the legislature, and that the lawsuit was a catalyst in the bringing about the legislative action.

It is important to note that the defendants offered no affidavits or evidence that contradicted the sworn testimony of these three Texas legislators who all clearly stated that the present lawsuit was a significant factor in the introduction and passage of the legislation which forced the defendants to adopt the precleared gubernatorial method for appointing election judges. The only support the defendants offered to bolster their argument that the lawsuit was not a catalyst for the legislation was a copy of a 1995 house bill with almost identical language to the language used in Senate Bill 130 and House Bill 331. The majority determines that the existence of a bill which proposed the gubernatorial method of selection before the lawsuit was filed

demonstrates that the 1997 legislation was already under consideration by the Texas legislature, and therefore the 1997 legislation could not have been catalyzed by the plaintiffs' lawsuit. However, the 1995 bill which passed in the Texas House was not adopted by the Texas Senate. Therefore, a bill proposing the gubernatorial method of appointment was not under consideration by the legislature when the plaintiffs filed their lawsuit in the fall of 1996. Moreover, there is no support in the case law for the notion that the preexistence of a legislative concept is a per se bar to an evidentiary determination of catalytic effect. Senator West and Representative Danburg who introduced the 1997 bills in the Senate and Houses were unequivocal in their testimony that it was the plaintiffs' lawsuit that was the catalyst for their introduction of the bill. The majority does not appear to question the truthfulness or veracity of Senator West or Representative Danburg's testimony. Therefore, absent the presence of contradicting affidavits or other substantive evidence the defendant's alternative explanation of the 1995 bill as a motivation for the legislator's introduction of the 1997 bill was correctly found by the district court to be unavailing.[10]

---

[10] The majority states that their conclusion that the three Texas legislators' statements are not sufficient evidence is strengthened by the fact that plaintiffs' point to no other evidence in the legislative record which affirmatively shows that the Texas legislature acted in response to the plaintiffs' lawsuit. However, there was one mention of the lawsuit in the legislative record. Steve McDonald, an employee of the Texas Democratic party, submitted an affidavit to the district court which stated that he

Finally, the majority cites <u>Milton v. Shalala</u>, 17 F.3d 812 (5th Cir. 1994) for their proposition that it is difficult to establish a causal connection between the legislature's actions and an individual suit. In <u>Milton</u>, this court rejected a plaintiff's claim for attorneys' fees where the plaintiff was one of the thousands of litigants whose lawsuits may have helped spur the enactment of a social security disability reform act. The panel stated that the mere possibility that the United States Congress acted because of an individual claimant's suit is too speculative to credit a change in the federal law to a claimant's individual lawsuit. <u>Milton</u>, 17 F.3d at 815. I do not quarrel with the holding in <u>Milton</u>. Unlike <u>Milton</u>, the present plaintiffs' lawsuit was not simply one of thousands of lawsuits that all sought redress for the same complaint making it difficult to establish a nexus between any one of the many lawsuits and the congressional action.

The record does not indicate that there were any other lawsuits pending to address appointment procedures for election judges in Texas. Unlike <u>Milton</u>, the plaintiffs' action in this case was unique in its challenge, and is specifically credited by the sponsoring legislators as a catalyst in the introduction and passage of the legislation. Furthermore, there is no indication that the plaintiff in <u>Milton</u> offered any evidence to establish a

---

testified about the 1997 bill in the Texas Senate, and during his testimony specifically cited this litigation as a reason for the Senate to adopt the bill. No counter affidavit is found in the record.

causal link between his individual lawsuit and the congressional action taken. In contrast, these plaintiffs have offered the uncontradicted, sworn declarations of three Texas legislators who state that the present lawsuit was a catalyst in the passage of the 1997 legislation.

For the above reasons I disagree with the majority that the district court clearly erred in finding that the plaintiffs' lawsuit was not a substantial factor in the passage of legislation which forced the defendants to adopt the precleared gubernatorial method of appointing election judges. The plaintiffs met the goals of their lawsuit in that the lawsuit caused the defendants to abandon the 1996 order. The plaintiffs also received a favorable decision from the Supreme Court that the appointment procedures for election judges are subject to § 5 of the Voting Rights Act. Finally, the plaintiffs were reappointed to their offices as election judges. This occurred as a result of the 1997 Texas legislation which forced the defendants to modify their procedures. According to all the substantive evidence presented to the district court this new legislation was catalyzed by the plaintiffs' lawsuit. The factual determinations of the district court are amply supported by the record. Therefore, the district court did not abuse its discretion in awarding attorneys fees to the plaintiffs under 42 U.S.C. § 1731(e). Accordingly, I respectfully dissent.